UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA          :      SEALED INDICTMENT

           - v. -          :      22 Cr. ____

ALEKSANDR MIKHAYLOVICH BABAKOV,   :
ALEKSANDR NIKOLAYEVICH VOROBEV,   :
  and                              :
MIKHAIL ALEKSEYEVICH PLISYUK,     :

       Defendants.           :      **22 CRIM 211**

- - - - - - - - - - - - - - - - X

## INTRODUCTION

1.  ALEKSANDR MIKHAYLOVICH BABAKOV, ALEKSANDR NIKOLAYEVICH VOROBEV, and MIKHAIL ALEKSEYEVICH PLISYUK, the defendants, have operated an international foreign influence and disinformation network to advance the interests of the Russian Federation ("Russia").  Through these operations aimed at influencing the course of international affairs, the defendants worked to weaken U.S. partnerships with European allies, undermine Western sanctions, and promote Russia's illicit actions designed to destroy the sovereignty of Ukraine.  BABAKOV, a Russian government official, together with VOROBEV and PLISYUK, both members of BABAKOV's staff, schemed to affect U.S. policy towards Russia through staged events, paid propaganda, and the recruitment of at least one American citizen to do their bidding

in unofficial capacities.  In pursuit of these goals, the
defendants sought to co-opt U.S. and European politicians and to
influence public opinion in their favor, using American and
European citizens as their proxies in an effort to validate
them, bring them access to power, evade sanctions, and obscure
their true objective to advance Russia's foreign policy.

2.  Beginning at least in or about January 2012, ALEKSANDR
MIKHAYLOVICH BABAKOV, ALEKSANDR NIKOLAYEVICH VOROBEV, and
MIKHAIL ALEKSEYEVICH PLISYUK, the defendants, conspired to
recruit individuals, including an American citizen ("CC-1"), to
represent and advance the foreign influence objectives of Russia
in the United States, without notifying the Attorney General as
required by law.  The defendants paid at least two Europe-based
consultants ("CC-2" and "CC-3") to also serve as their agents
abroad, and manage their influence network in the United States
and elsewhere.  Both directly and through these paid
consultants, the defendants directed and controlled CC-1's
activities on their behalf in the United States, including,
among other things:

a.  Contacting members of the U.S. Congress from at
least 2012 into 2017 to seek meetings, and to offer free travel
to at least one Congressmember, on behalf of BABAKOV and other

2

foreign officials aligned and associated with BABAKOV;

b.    Requesting a meeting for BABAKOV in or about
March 2017 with a member of the U.S. Congress for the purpose of
advancing Russia's position in the United States, drafting a
related letter requesting the meeting, and sending the letter to
the Congressmember on behalf of BABAKOV;

c.    Contacting a member of the U.S. Congress in 2017
to offer free travel to a conference in Yalta, Crimea, as a
service on behalf of the purported "Prime Minister of Crimea,"
Sergey Aksyonov, who was at the time and remains under sanctions
imposed by the United States Department of the Treasury's Office
of Foreign Assets Control ("OFAC"), which designated Aksyonov as
a Specially Designated National ("SDN") based on his role in
actions or policies that "threaten the peace, security,
stability, sovereignty, or terroritorial integrity of Ukraine,"
and for "actions or policies that undermine democratic processes
or institutions in Ukraine."  The defendants worked together and
with their associates to organize, facilitate, and promote the
Yalta conference, including by soliciting Americans to attend
and present at the conference and receive funding from
Aksyonov's organizing committee, for the benefit of Aksyonov and
his Russia-backed purported government of Crimea.

3.    In connection with these foreign influence activities,
ALEKSANDR MIKHAYLOVICH BABAKOV, ALEKSANDR NIKOLAYEVICH VOROBEV,
and MIKHAIL ALEKSEYEVICH PLISYUK, the defendants, submitted
fraudulent visa applications in or about February 2017 seeking
to travel to the United States under the false pretense of each
traveling alone for a "vacation" and citing CC-1 as a "friend."
In fact, the defendants planned to travel to the United States
together to conduct meetings with U.S. political officials and
advisors, in furtherance of their foreign influence scheme.   The
defendants' visa applications were ultimately denied in or about
January 2018.

### The Defendants and Their Foreign Co-Conspirators

4.    ALEKSANDR MIKHAYLOVICH BABAKOV, the defendant, is a
high-ranking Russian government official, and has served as a
Russian government official at all times relevant to this
Indictment.   BABAKOV currently serves as the Deputy Chairman of
the State Duma, the lower house of the Russian legislature.
From approximately September 2014 to October 2021, BABAKOV
served as a member of the Russian Federation Council, the upper
house of the Russian legislature, and therefore had the title of
"Senator."   From approximately 2003 to 2014, BABAKOV served as a
member of the State Duma, where he held prominent roles such as

Chair of the State Duma Commission on Legislative Provisions for Development of the Military-Industrial Complex of the Russian Federation.  In or about 2011, BABAKOV joined the United Russia party, which is the political party of Russian President Vladimir Putin.  On or about June 17, 2012, Putin appointed BABAKOV to be the Russian Federation's Special Representative for Cooperation with Organizations Representing Russians Living Abroad.  BABAKOV has become a leader in the "For Truth" party formed in or about 2021, which supports Putin.

5.    ALEKSANDR NIKOLAYEVICH VOROBEV, the defendant, is the Chief of Staff for ALEKSANDR MIKHAYLOVICH BABAKOV, the defendant, and VOROBEV has held that position at all times relevant to this Indictment.

6.    MIKHAIL ALEKSEYEVICH PLISYUK, the defendant, serves on the staff of ALEKSANDR MIKHAYLOVICH BABAKOV, the defendant, and PLISYUK has served on BABAKOV's staff at all times relevant to this Indictment.

7.    Since in or about 2012, ALEKSANDR MIKHAYLOVICH BABAKOV, ALEKSANDR NIKOLAYEVICH VOROBEV, and MIKHAIL ALEKSEYEVICH PLISYUK, the defendants, have used a nonprofit organization based in Russia known as the "Institute for International Integration Studies" ("IIIS") as a front for a

global foreign influence campaign to advance Russia's foreign policy objectives.  BABAKOV serves as the President of the IIIS. VOROBEV serves as the General Director of the IIIS.  PLISYUK serves as the Executive Director of the IIIS.

8.   CC-2 and CC-3, nationals of a country in Western Europe ("Country-1"), worked as foreign consultants on behalf of ALEKSANDR MIKHAYLOVICH BABAKOV, ALEKSANDR NIKOLAYEVICH VOROBEV, and MIKHAIL ALEKSEYEVICH PLISYUK, the defendants, from at least approximately 2011 to 2019, with funding funneled through the IIIS.

9.   On or about June 20, 2017, OFAC designated ALEKSANDR MIKHAYLOVICH BABAKOV, ALEKSANDR NIKOLAYEVICH VOROBEV, and MIKHAIL ALEKSEYEVICH PLISYUK, the defendants, as Specially Designated Nationals pursuant to Executive Order 13661, which authorizes sanctions on, among others, any individual or entity that is owned or controlled by, or that has provided material or other support to, persons operating in the arms or related materiel sector in the Russian Federation, and officials of the Government of the Russian Federation.  OFAC explained that BABAKOV was "being designated as an official of the Government of the Russian Federation," and that both VOROBEV and PLISYUK were "being designated for acting or purporting to act for or on

behalf of, directly or indirectly, Alexander Babakov."

## Background on Russian Foreign Influence Operations

10.   Among the foreign policy objectives of Russian government leadership is to expand Russia's sphere of influence, and Russia targets, among other countries, the United States and U.S. allies to further that goal.  Through these influence operations, Russia attempts to shape foreign perceptions and to influence populations, including by seeking to create wedges that reduce trust and confidence in democratic processes, degrading democratization efforts, weakening U.S. partnerships with European allies, undermining Western sanctions, encouraging anti-U.S. and anti-Western political views, and countering efforts to bring Ukraine and other former Soviet states into European and international institutions.

11.   Russian influence operations often use social media targeted at U.S. and global audiences to sow discord and mistrust in the U.S. and other countries' political systems; disseminate disinformation to confuse and mislead citizens in the United States, Europe, and Russia itself; and to recruit U.S. persons to advance Russia's operational goals.

12.   As part of these efforts, Russia has recruited and forged ties with persons and groups around the world who are

positioned to amplify and reinforce Russia's messaging campaigns
in furtherance of its goals of destabilizing Western societies.
These efforts have included the use of nonprofit organizations
as fronts to promote connections between Russia and its
"compatriots" living abroad, to propagate disinformation, and to
surreptitiously seek access to foreign officials,
businesspersons, and other figures, in the United States and
elsewhere, to advance and promote Russian interests.

**The Defendants Recruit a U.S. Agent to Work on Behalf of BABAKOV**

13.  Beginning in or about September 2011, CC-2 began to
recruit CC-1, a New York City-based individual with experience
relating to international relations and media, to act on behalf
of ALEKSANDR MIKHAYLOVICH BABAKOV, ALEKSANDR NIKOLAYEVICH
VOROBEV, and MIKHAIL ALEKSEYEVICH PLISYUK, the defendants, and
their foreign influence operation designed to advance Russia's
interests.  CC-2 contacted and began communicating with CC-1
through social media.  CC-2 proposed to bring CC-1 to the
attention of BABAKOV, whom CC-2 referred to as "my friend vice
speaker of Russian State Duma."[1]  CC-1 accepted CC-2's offer.

---

[1] All descriptions and quotations of communications are set forth
in substance and in part, and are based in part on draft
translations of foreign language communications.  Typographical

14.   CC-2 then solicited CC-1's assistance to work on a
"national campaign," purportedly for human rights and the cause
of Cuba, in which CC-1 would, among other things, promote the
initiative in the United States and lobby members of the U.S.
Congress, including a then-member of the U.S. House of
Representatives ("Congressmember-1").  CC-1 agreed to help "in
any way possible."

15.   At around this time, ALEKSANDR MIKHAYLOVICH BABAKOV,
the defendant, publicly expressed his support for Russian
President Vladimir Putin's "approaches to building the country's
foreign policy priorities, including the prospects for
developing relations with the United States," blaming
"instability" of the U.S.-Russia relationship on "well-known
stereotypes and phobias, as well as the absence of a solid
economic foundation," and "destructive steps in the field of
missile defense, NATO [North Atlantic Treaty Organization]
expansion to the East."

16.   In or about March 2012, CC-2 coordinated a meeting in
New York City between CC-1 and CC-3, and informed CC-1 that CC-3
was "working with Babakov, vice speaker state russian's Duma."

---

and grammatical errors are reproduced as found in the original
communications unless otherwise indicated.

17.   On or about March 12, 2012, CC-1 sent electronic messages to an associate in which he described his meeting with CC-3, including that CC-3 "invited me to go to [Country-1] and ru[ss]ia / all expenses paid /. . . . it's a great opportunity."

18.   CC-3 thereafter emailed ALEKSANDR NIKOLAYEVICH VOROBEV, the defendant, to report on the status of CC-3's trip to the United States for the foreign influence scheme.   CC-3 reported that "my visit in the USA goes fine" and that "I found our American partners very interested to establish a contact with YOU."   In the same email, CC-3 wrote that he planned to "arrange a meeting for YOU and YOUR Boss at the US Congress at the end of may / beginning of june."

## The Defendants Direct Their U.S. Agent to Broker Meetings with U.S. Politicians

19.   On or about March 21, 2012, CC-3 reported in an email to ALEKSANDR NIKOLAYEVICH VOROBEV, the defendant, that he planned to "call" CC-1 "in the US."   CC-3 explained that the purpose of the call was to start to "fix the meeting with the Senators."   CC-3 then asked VOROBEV:

> 1) do you think it is better to meet them first in Russia or in the USA? 2) how is it the procedure for you to get the US visa? do you need us to send you an invitation to visit the USA? 3) before the Convention I anyway beli[e]ve it is important to create with them a feeling of trust and to make them understand Russia

isn't what it is described in the newspapers.  We
start already well because they are absolutely open to
Mr. P[utin] and not critic.

CC-3 then identified Congressmember-1 and a particular U.S.

Senator to lobby.

20.  On or about March 28, 2012, CC-3 emailed ALEKSANDR

NIKOLAYEVICH VOROBEV, the defendant, to confirm that CC-3 had

contacted CC-1 "in the USA" and that a "meeting" between

ALEKSANDR MIKHAYLOVICH BABAKOV, the defendant, and

Congressmember-1 "will take place" in a European city ("City-2")

in May 2012.  CC-3 explained that CC-3 "control[led] all this

people and projects," and that CC-1 was "very much pleased to

work in this field together to create a fri[e]ndly contact

between American and Russian MPs" (i.e., members of the Russian

legislature).  Finally, CC-3 requested a "basic sponsorship,"

i.e., payments, because he had already "spent the last 1000

[USD] i kept for me from Venice."  CC-3 further stated that "i

had to do a little 'gift' for the organization of that meeting

in [City-2]."

21.  CC-1 continued to work to secure a meeting for

ALEKSANDR MIKHAYLOVICH BABAKOV, the defendant, with

Congressmember-1 in City-2. CC-1 later described, in a series of

electronic messages with an associate, that in April 2012, one

of the co-conspirators from Country-1 "told me" to "[i]nvite [Congressmember-1] to [City-2], all expenses paid" to meet with European politicians and receive "an award."  CC-1 stated that he left Congressmember-1 "100,000,000 voicemails" after receiving this direction from CC-3, but that Congressmember-1 did not accept the invitation.

22.   On or about May 16, 2012, CC-1 sent emails to the offices of three additional members of the U. S. House of Representatives.   In each email, CC-1 falsely described himself as the "President and CEO" of a nonprofit organization and extended a purported "official invitation by high ranking members" of a European government to visit their parliament in City-2 and to meet with unspecified "senior officials" of "European governments this summer."   That year, the IIIS held a conference in City-2.

### The Crimea Conflict and Resulting Sanctions

23.   In or about February and March 2014, Russia invaded and purported to annex the Crimean Peninsula ("Crimea") from Ukraine.

24.   The International Emergency Economic Powers Act ("IEEPA"), codified at Title 50, United States Code, Sections 1701-1708, confers upon the President authority to deal with

unusual and extraordinary threats to the national security and foreign policy of the United States.   Section 1705 provides, in part, that "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this chapter."   50 U.S.C. § 1705(a).

25.   In 2014, pursuant to his authorities under IEEPA, the President issued Executive Order 13660, which declared a national emergency with respect to the situation in Ukraine, stating that "persons who have asserted governmental authority in the Crimean region without the authorization of the Government of Ukraine" presented an "unusual and extraordinary threat to the national security and foreign policy of the United States."   To address this national emergency, the President blocked all property and interests in property that were then or thereafter came within the United States or the possession or control of any U.S. person, of individuals determined by the Secretary of the Treasury to meet one or more enumerated criteria.   These criteria include, but are not limited to, individuals determined to be responsible for or complicit in, or who engage in, actions or policies that threaten the peace, security, stability, sovereignty, or territorial integrity of

Ukraine; or who materially assist, sponsor, or provide financial, material, or technological support for, or goods or services to, individuals or entities engaging in such activities. Executive Order 13660 prohibits, among other things, (i) "the making of any contribution or provision of funds, goods, or services by, to, or for the benefit of any person whose property and interests in property are blocked pursuant to this order"; (ii) "the receipt of any contribution or provision of funds, goods, or services from any such person"; (iii) "[a]ny transaction that evades or avoids, has the purpose of evading or avoiding, causes a violation of, or attempts to violate any of the prohibitions set forth in this order"; and (iv) "[a]ny conspiracy formed to violate any of the prohibitions set forth in this order."

26. The national emergency declared in Executive Order 13660 with respect to the situation in Ukraine has remained in continuous effect since 2014, and was most recently continued on or about March 2, 2022.

27. The President twice expanded the scope of the national emergency declared in Executive Order 13660, through: (i) Executive Order 13661, issued on or about March 16, 2014, which addressed the actions and policies of Russia with respect to

Ukraine, including the deployment of Russian military forces in Crimea, and stated that "the actions and policies of the Government of the Russian Federation with respect to Ukraine—including the recent deployment of Russian Federation military forces in the Crimea region of Ukraine," presented an "unusual and extraordinary threat to the national security and foreign policy of the United States"; and (ii) Executive Order 13662, issued on or about March 20, 2014, which further addressed the actions and policies of the Russian government, including its purported annexation of Crimea and its use of force in Ukraine.

28.   The above-described Executive Orders authorized the Secretary of the Treasury to take such actions, including the promulgation of rules and regulations, and to employ all powers granted to the President under IEEPA, as may be necessary to carry out the purposes of those orders.  The Executive Orders further authorized the Secretary of the Treasury to redelegate any of these functions to other offices and agencies of the United States Government.

29.   To implement these Executive Orders, OFAC issued certain Ukraine-related sanctions regulations.  These regulations incorporate by reference the definition of prohibited transactions set forth in Executive Order 13660.  See

31 C.F.R. § 589.201.  The regulations also provide that the
names of persons designated directly by the Executive Orders, or
by OFAC pursuant to the Executive Orders, whose property and
interests are therefore blocked, are published in the Federal
Register and incorporated into the Specially Designated
Nationals (SDN) and Blocked Persons List, which is published on
OFAC's website.  Id. Note 1.

30.  On or about March 17, 2014, OFAC designated Sergey
Aksyonov as an SDN pursuant to Executive Order 13660.  In so
designating Aksyonov, OFAC explained that the designation of
Aksyonov was based on his "role in actions or policies that
threaten the peace, security, stability, sovereignty, or
territorial integrity of Ukraine."  The OFAC designation further
explained: "Aksyonov claims to be the Prime Minister of Crimea
and has rejected the authority of the legitimate government in
Kyiv.  He has appealed to Moscow to send troops to Ukraine.
Aksyonov has also announced that local security forces including
the police and the army, which are under Kyiv's command, would
be brought under his control."  Accordingly, as a result of that
designation, and pursuant to Executive Order 13660, Aksyonov's
property was blocked, he was barred from traveling to the United
States, and U.S. persons were prohibited from engaging in any of

the prohibited transactions described above for the benefit of Aksyonov or to evade the sanctions on Aksyonov.

31.  ALEKSANDR MIKHAYLOVICH BABAKOV, ALEKSANDR NIKOLAYEVICH VOROBEV, and MIKHAIL ALEKSEYEVICH PLISYUK, the defendants, and their co-conspirators, including CC-1, were aware of and following the events in Crimea and resulting sanctions.  For example, on or about March 18, 2014, the day after Aksyonov's OFAC designation, CC-1 posted a photo on a social media website of Aksyonov standing alongside Russian President Vladimir Putin, and directed the post to VOROBEV, CC-2, and CC-3.  Several weeks later, CC-1 made another post referencing a news article regarding "the new US sanctions on Russia."  Additionally, on or about September 18, 2014, VOROBEV received a document listing BABAKOV and Aksyonov as persons under sanctions issued by the European Union.  BABAKOV was sanctioned by the European Union based in part on the fact that he voted "yes" on a Russian bill for the annexation of Crimea.  As described below, notwithstanding these sanctions, the defendants and their co-conspirators pressed forward with their illicit foreign influence scheme, including with respect to promoting Russia's annexation of Crimea, and ultimately conspired to engage in prohibited transactions for the benefit of SDN Aksyonov in 2017.

## The Defendants Direct a Russian Propaganda Campaign on the Crimea Conflict

32.    To support Russia's illegitimate annexation of Crimea, the defendants paid individuals to be sham "election observers" in an effort to falsely validate the results of a referendum staged to formally make Crimea part of Russia, amid the presence of Russian armed forces.  At the time, the General Assembly of the United Nations issued a resolution declaring that the purported Crimea referendum had "no validity," and the President of the United States issued a statement declaring that the United States and members of the international community would "not recognize the results of a poll administered under threats of violence and intimidation from a Russian military intervention that violates international law."

33.    For example, on or about March 7, 2014, MIKHAIL ALEKSEYEVICH PLISYUK, the defendant, attempted to recruit an American citizen ("Individual-1") -- who was engaged in pro-Russia public relations campaigns and writing pro-Russia articles in close coordination with PLISYUK around this time -- to participate in this scheme, stating in an email to Individual-1 that "we are organizing an observation international team" to travel first to Moscow and then on to

Yalta, in the Crimea region, "to monitor [the] independence referendum there on 16 March," and promising that "all expenses will be covered by us."

34. CC-2 and CC-3 joined this effort. On or about March 18, 2014, MIKHAIL ALEKSEYEVICH PLISYUK, the defendant, sent ALEKSANDR NIKOLAYEVICH VOROBEV, the defendant, a written statement co-signed by CC-2 and CC-3 regarding their work as "international observers" "invite[d]" by the "Republic of Crimea" to watch their referendum to join the Russian Federation. The statement claimed that the referendum process was legitimate and that "Crimea is historically part of Russia and it was a mistake that [it] was ceded to Ukraine." The statement referred to a meeting involving CC-2, CC-3, and a "Russian senator" -- a reference to ALEKSANDR MIKHAYLOVICH BABAKOV, the defendant -- and stated that, "[a]ccording to the Russian senator, Parliament and the Federation are ready to do whatever is necessary for the great region to be part of Russia in no time."

35. CC-1 also participated in this effort on behalf of the defendants. For example, on or about May 1, 2014, CC-1 contacted the head of an American internet publication via email and asserted that he had "access to Crimean officials and other

pro-Russian officials in Eastern Ukraine willing to go on the record to denounce US interference in the region and to give specifics about it." CC-1 cited his ties to "[Country-1] MPs and also members of the Russian Duma," that is, ALEKSANDR MIKHAYLOVICH BABAKOV, the defendant.

36. On or about October 30, 2014, MIKHAIL ALEKSEYEVICH PLISYUK, the defendant, directed CC-2 to provide a false story for the sham "election observer" scheme. PLISYUK stated in an email to CC-2: "If you be asked to comment on your mission to Donetsk [a region of Ukraine that Russia sought to annex] please tell the following[:] You've come at the invitation from local authorities[,] . . . Please do not comment on the future of Donetsk and Luhansk [another such contested region of Ukraine] — this is a sovereign choice of the population that Europe or other countries can make influence[,] . . . You've seen that everything is OK, . . . In your opinion all things are arranged well[,] . . . No violations, no illegal activities. . . ."

37. On or about November 13, 2014, CC-3 emailed MIKHAIL ALEKSEYEVICH PLISYUK, the defendant, reporting that he had been contacted by a U.S. newspaper for "an interview on Europe-Russia relations, the situation in Ukraine and the elections in the Donbass. Incredible! :)." CC-3 sought direction from PLISYUK:

"[l]et me know if you need me to say anything in particular."

38.   Also, in or about July 2016, CC-1 traveled to Europe for meetings in furtherance of the foreign influence scheme.   In preparation for the trip, CC-1 emailed ALEKSANDR NIKOLAYEVICH VOROBEV, the defendant.   CC-1 asked in the email to meet with VOROBEV and ALEKSANDR MIKHAYLOVICH BABAKOV, the defendant, in Europe during the trip.   VOROBEV responded by email to CC-1, stating, "Great idea. Let's do it."   However, VOROBEV noted that travel to Europe "[f]or Babakov it's a problem because he is in sanction list," referring to the European Union's sanctions on BABAKOV described above.   VOROBEV proposed that to meet BABAKOV, CC-1 would need to come to Russia or a specified European country, and offered "I can arrange all."   CC-1 responded by proposing to move the conversation to an encrypted communication application.

**The Defendants Intensify Their Foreign Influence Campaign**

39.   On or about December 7, 2016, ALEKSANDR NIKOLAYEVICH VOROBEV and MIKHAIL ALEKSEYEVICH PLISYUK, the defendants, communicated by email about the defendants' "Project" to promote Russia's interests in the United States and elsewhere.   VOROBEV explained the need for their ongoing foreign influence campaign, stating that "purely legal work in hostile regimes is not

enough, the effectiveness of this implies the need to promote specific processes in the field of close attention from the media, as well as the expert community of human rights activists, academics and political scientists." VOROBEV identified "the West" as the place to carry out such a campaign regarding "problematic frontiers for the movement," namely "the Baltic States, Poland, Moldova and Ukraine," stating that "it is necessary to launch an appropriate defensive campaign there [in the West]." VOROBEV proposed using a "Fund for the Support and Protection of the Rights of Compatriots (Living Abroad)" and collecting private donations "to fend off the accusations of the defense campaign that it is politicized by the interests of Russia."

40.  Around this same time, on or about January 2, 2017, MIKHAIL ALEKSEYEVICH PLISYUK, the defendant, drafted a document entitled "The leading role of Russia in the world – a permanently operating project." The document stated, among other things, that "Russia is very successful in its propaganda on the international level," that Russia had "effectively overcome the Western sanctions," and that "[n]ow the time has come to use all these advantages in favour of our country that will help consolidate Russia's international image," including

by taking steps "[t]o recruit to our side some prominent and well-known persons of world culture and use their potential through launching various international propaganda campaigns and events in favour of Russia," noting that "[t]here is a good background to start this work thanks to our contacts in the West."  PLISYUK's plan identified a number of prominent Americans as potential targets of this effort.

### The Defendants Lie in an Effort to Obtain U.S. Visas

41.  By January 2017, ALEKSANDR MIKHAYLOVICH BABAKOV, ALEKSANDR NIKOLAYEVICH VOROBEV, and MIKHAIL ALEKSEYEVICH PLISYUK, the defendants, planned to deploy CC-1 to obtain meetings in the United States with individuals perceived to have political influence, and to use CC-1's status as an American citizen to help them gain access to visas to travel to the United States for these meetings, all in furtherance of the defendants' foreign influence operations.

42.  On or about January 11, 2017, CC-3 sent an email to ALEKSANDR NIKOLAYEVICH VOROBEV, the defendant, regarding the scheme, with the subject "I: Washington."  CC-3 stated that CC-3 and CC-1 were working together to arrange the defendants' "visit to the U.S.," and identified certain of "the people to meet for which I am dealing with [CC-1] to organize your meeting.  CC-3

sought VOROBEV's direction, stating, "Let me know if you need in particular a meeting with a specific person."

43. On or about January 31, 2017, in preparation for the defendants' anticipated meetings in the United States to further their foreign influence scheme, MIKHAIL ALEKSEYEVICH PLISYUK, the defendant, drafted a document setting forth "Abstracts for USA," which identified "[t]he most relevant topics for Moscow and Washington" as including "building up cooperation to normalize the situation in Ukraine," that is, Russia's illegitimate annexation of Ukrainian territory, "elaboration of issues of further reduction of nuclear potentials and confidence-building measures in the military sphere, including with regard to NATO's policy in Eastern Europe and the problem of building up conventional weapons near Russia's borders," and "search for joint approaches to the issue of lifting sanctions."

44. On or about February 7, 2017, ALEKSANDR MIKHAYLOVICH BABAKOV, ALEKSANDR NIKOLAYEVICH VOROBEV, and MIKHAIL ALEKSEYEVICH PLISYUK, the defendants, each applied for B1/B2 visas to enter the United States, using their personal passports. All three applications were submitted electronically, one after the other within the span of a few hours, from the same Internet Protocol address located in

Moscow.  Each defendant's visa application listed CC-1 as his
"Contact" in the United States, and each defendant identified
CC-1 as a "friend" in the application.  Each defendant falsely
represented in his application that he was traveling alone.  In
fact, as described above, the defendants planned to travel to
the United States together to conduct meetings in furtherance of
their foreign influence scheme, and CC-1 was their U.S.-based
associate working to facilitate such meetings.

45.  On or about February 8, 2017, ALEKSANDR MIKHAYLOVICH
BABAKOV, ALEKSANDR NIKOLAYEVICH VOROBEV, and MIKHAIL
ALEKSEYEVICH PLISYUK, the defendants, were each interviewed by
U.S. consular officers stationed at the U.S. Embassy in Moscow
in connection with their visa applications.  During those
interviews, the defendants lied about the true purpose of their
trip, hiding their plans to gain access to U.S. political
officials and advisors.  As reflected in U.S. consular records
of those interviews, BABAKOV falsely claimed to be "traveling to
NYC for vacation alone."  PLISYUK falsely claimed to be
traveling "to visit friends NYC and DC."  And VOROBEV falsely
claimed that the purpose of his travel was "[t]o continue to
vacation/visit friends," and misleadingly stated that he worked
as a "PR [Public Relations] Consultant at [an] Education

Integration company." Neither VOROBEV nor PLISYUK made any
reference to the fact that they worked for BABAKOV, a Russian
Senator.

46.   The U.S. Department of State did not issue visas to
the defendants at that time, and initiated a review of their
applications. As noted above, on or about June 20, 2017, OFAC
designated the defendants as SDNs. Shortly after the
designations, on or about June 27, 2017, ALEKSANDR MIKHAYLOVICH
BABAKOV, the defendant, requested his passport back from the
pending visa application. The visa applications for the three
defendants ultimately were denied on or about January 18, 2018.

### The Defendants Deploy CC-1 in an Attempt to Influence a U.S. Congressmember

47.   In 2017, ALEKSANDR MIKHAYLOVICH BABAKOV, ALEKSANDR
NIKOLAYEVICH VOROBEV, and MIKHAIL ALEKSEYEVICH PLISYUK, the
defendants, directed CC-1 to target another then-member of
Congress ("Congressmember-2"), who had publicly expressed
support for Russian interests, as part of the defendants'
ongoing foreign influence scheme. The conspirators sought to
obtain a meeting for BABAKOV with Congressmember-2 in the United
States.

48.   In or about March 2017, CC-1 acted on these directions

by drafting a letter (the "March 2017 Letter") for approval by
ALEKSANDR MIKHAYLOVICH BABAKOV, the defendant, to be sent to
Congressmember-2 requesting the meeting.  The letter drafted by
CC-1 for BABAKOV was addressed to Congressmember-2 and began by
stating, "I [BABAKOV] want to start this letter by thanking you
for having accepted the meeting that our friend and
representative in the United States, [CC-1], requested on our
behalf."  CC-1's draft for BABAKOV went on to note that "I
[BABAKOV] applied for a US visa about a month ago," but that the
visa had not yet been granted, and "this has forced me to cancel
our rendezvous that we had scheduled for Wednesday, March 8th."
The letter further stated, "One of the main objectives of my
planned visit to your country, is to explore ways in which we
could deepen and strengthen the ties of cooperation between our
two great nations and the legislative bodies we both represent,"
and the letter concluded, "I hope to be able to visit you in the
very near future."  CC-1's draft letter included a signature
block in the name of "Alexander Babakov, Deputy Chair, Foreign
Affairs Committee, Council of the Federation (Russia's Senate),
Presidential Envoy for the Russian Organizations Overseas."

49.  On or about March 7, 2017, CC-1 sent the draft March
2017 Letter to MIKHAIL ALEKSEYEVICH PLISYUK, the defendant, and

CC-3 for approval.  In his email, CC-1 requested that, if the letter was approved and after the defendants had made any edits, BABAKOV should sign the letter on "official letterhead" for transmission to Congressmember-2's office.

50.  Three days later, on or about March 10, 2017, ALEKSANDR MIKHAYLOVICH BABAKOV, the defendant, sent an executed version of the March 2017 Letter to MIKHAIL ALEKSEYEVICH PLISYUK, the defendant.  The executed letter described CC-1 merely as a "friend" and not also "representative" -- consistent with the defendants' visa applications similarly misrepresenting their association with CC-1, and in an effort to conceal that CC-1 was acting as an agent of BABAKOV -- who had "requested" the meeting with Congressmember-2 "on our behalf."  CC-1 thereafter transmitted the March 2017 Letter to Congressmember-2's office.

51.  On or about April 3, 2017, CC-1 followed up by email with Congressmember-2's office, stating "I just wanted to know if you had received the letter from Sen Babakov, and if it had been passed to [Congressmember-2]."  A member of Congressmember-2's staff responded by email and confirmed receipt of the March 2017 Letter signed by ALEKSANDR MIKHAYLOVICH BABAKOV, the defendant, requesting a meeting for BABAKOV with Congressmember-

2.   CC-1 forwarded the confirmation to MIKHAIL ALEKSEYEVICH PLISYUK, the defendant, and CC-3.

### The Defendants Coordinate with Their U.S. Agent to Provide Services and Offer Payments to U.S. Persons to Benefit SDN Sergey Aksyonov

52.   In March 2017, the U.S. Department of State issued a statement reaffirming its commitment to a sovereign Ukraine; again renouncing the purported March 2014 referendum in Crimea; and declaring that "Crimea-related sanctions will remain in place until Russia returns control of the peninsula to Ukraine."

53.   In the days and weeks to follow, as part of their foreign influence operations specifically targeting Western perceptions of Russia's actions in Ukraine, ALEKSANDR MIKHAYLOVICH BABAKOV, ALEKSANDR NIKOLAYEVICH VOROBEV, and MIKHAIL ALEKSEYEVICH PLISYUK, the defendants, worked together and with their associates, including U.S. citizen CC-1, to coordinate a conference in Yalta, part of Russia-controlled Crimea, for the benefit of SDN Aksyonov, purported "Prime Minister of Crimea," and to secure the services and attendance of American citizens for the Conference, in contravention of the above-described sanctions levied against Aksyonov in 2014.  To induce Americans to attend the Conference, the defendants offered payments, namely, an all-expenses-paid trip, to at least

one American businessman and at least one U.S. Congressmember,
with the payments to be made by an entity headed by Aksyonov --
the organizing committee for the Conference.

54.  ALEKSANDR MIKHAYLOVICH BABAKOV, ALEKSANDR NIKOLAYEVICH
VOROBEV, and MIKHAIL ALEKSEYEVICH PLISYUK, the defendants,
assisted in coordinating the Conference through their operation
of another entity, the International Council of Russian
Compatriots (abbreviated "MSRS" in Russian).  BABAKOV is the
Chairman of the MSRS's Board of Trustees.  The MSRS carries out
its activities in coordination with the Foundation for the
Support and Protection of the Rights of Compatriots Living
Abroad, an entity that was created in 2012 by Russian
presidential decree, for which Russian Foreign Minister Sergey
Lavrov serves as Chairman of the Board of Trustees, and which
has public ties to Russian intelligence services; as well as
Rossotrudnichestvo, the Russian Federal Agency for the
Commonwealth of Independent States, Compatriots Living Abroad,
and International Cultural Cooperation, a Russian government
entity subordinate to the Russian Ministry of Foreign Affairs,
which serves as the cultural diplomacy arm of the Russian
Federation with the publicly stated mandate to promote "an
objective perception of modern Russia, its material and

spiritual potential, and the nature of the country's internal and foreign policy."

55.   At least in part through the MSRS, ALEKSANDR MIKHAYLOVICH BABAKOV, ALEKSANDR NIKOLAYEVICH VOROBEV, and MIKHAIL ALEKSEYEVICH PLISYUK, the defendants, participated in the Yalta Conference, promoted the event for Aksyonov, collected responses from invitees on Aksyonov's behalf, and aided in managing and planning the content of speeches and events at the Conference.

56.   On or about April 6, 2017, an MSRS official ("CC-4") sent an email invitation to an American businessman to attend the Conference.  The email confirmed the role of ALEKSANDR MIKHAYLOVICH BABAKOV, the defendant, in managing invitations to the Conference, stating that, "thanks to the efforts of the MSRS and the personal appeal of the Special Representative of the President for interaction with the organizations of compatriots abroad Babakov A.M. to the leadership of Crimea, we managed to get a quota for 13 people" to attend the Conference.  The same message solicited potential services from the American businessman, stating that "[w]e would also be grateful if [you] prepared a speech at the Forum."  The email offered payment for travel, accommodation, meals, and "costs of participation"

covered by the "Organizing Committee" headed by Aksyonov to attract the American businessman.

57. On or about April 14, 2017, CC-4 described in an email to another potential Conference speaker that MIKHAIL ALEKSEYEVICH PLISYUK, the defendant, "will be the representative of the MSRS at this forum" and informed this potential speaker that PLISYUK "would like to meet with you before the start of the Forum." The potential speaker thereafter submitted a draft speech, which was sent by MSRS personnel to PLISYUK for review.

58. As part of their efforts to promote and coordinate Aksyonov's Conference, in or about April 2017, ALEKSANDR MIKHAYLOVICH BABAKOV, ALEKSANDR NIKOLAYEVICH VOROBEV, and MIKHAIL ALEKSEYEVICH PLISYUK, the defendants, directed CC-1 to recruit Congressmember-2 for the event. On or about April 10, 2017, CC-1 sent an email to Congressmember-2's office attaching an invitation addressed to Congressmember-2 to attend Aksyonov's Conference in Yalta. The invitation promoted the conference as "one of Russia's key business events," aimed at "promoting dialogue between business and government and addressing issues related to realizing economic potential of the Republic of Crimea and Sevastopol," and was signed by Aksyonov. The invitation further stated that "[m]uch of the work at the

[Conference] will be dedicated to a series of individual meetings of the representatives of the Government of the Republic of Crimea with potential investors," indicating that an objective of the Conference was procuring investments to advance Russia's interests in Crimea.   In his email transmitting the invitation, CC-1 offered for "all expenses" to be paid for Congressmember-2's travel by the "organizing committee," which was headed by Aksyonov.   Congressmember-2 ultimately did not accept the invitation.

59.   In or about September 2017, MIKHAIL ALEKSEYEVICH PLISYUK, the defendant, circulated within the IIIS an article that ALEKSANDR MIKHAYLOVICH BABAKOV, the defendant, had published, entitled "Compatriots as a Factor of Russian Foreign Policy."   The article discussed BABAKOV's use of the Conference to promote Russia's foreign policy interests, and his role in coordinating the Conference, which took place in or about April 2017, including by seeking to secure the attendance of individuals from the United States.   BABAKOV stated:

> I managed to facilitate arrival of a group of our compatriots to the [Conference], they came from Europe, America, Australia, Israel and other countries. During their participation in the sessions of the Forum, all of them confirmed the support of reintegration of Crimea into Russia. . . .

The compatriots also painfully react to the anti-Russian campaign launched in the West lately, namely, in relation with the economic and political sanctions imposed against Russia, hysteria over Moscow supposedly tactic of interference into political processes in the USA and Europe. . . . After my appointment to the post of the Special Presidential Envoy of the Russian Federation for interaction with organizations of compatriots abroad I've got additional opportunities and powers to continue working with countrymen. . . . and for promotion of the interests of Russian foreign policy.

### STATUTORY ALLEGATIONS

### Count One

(Conspiracy to Act as an Agent of a Foreign Government Without Notifying the Attorney General)

The Grand Jury charges:

60.  The allegations contained in paragraphs 1 through 59 of this Indictment are incorporated as though fully set forth herein.

61.  From at least in or about 2012, up to and including at least in or about June 2017, in the Southern District of New York, Russia, and elsewhere outside of the jurisdiction of any particular State or district of the United States, ALEKSANDR MIKHAYLOVICH BABAKOV, ALEKSANDR NIKOLAYEVICH VOROBEV, and MIKHAIL ALEKSEYEVICH PLISYUK, the defendants, and others known and unknown, at least one of whom is expected to be first

brought to and arrested in the Southern District of New York, knowingly combined, conspired, confederated, and agreed together and with each other to commit an offense against the United States, to wit, acting as an agent of a foreign government without prior notification to the Attorney General, in violation of Title 18, United States Code, Section 951.

62.   It was a part and an object of the conspiracy that CC-1, who is a U.S. person, and others known and unknown, knowingly would and did act in the United States as an agent of a foreign government and foreign officials, to wit, the Russian Federation and officials of that government, without prior notification to the Attorney General, as required by law, in violation of Title 18, United States Code, Section 951.

63.   In furtherance of the conspiracy and to effect the illegal object thereof, ALEKSANDR MIKHAYLOVICH BABAKOV, ALEKSANDR NIKOLAYEVICH VOROBEV, and MIKHAIL ALEKSEYEVICH PLISYUK, the defendants, and their co-conspirators, committed the following overt acts, among others:

a.   In or about early 2012, CC-1 attempted to contact Congressmember-1 to set up a meeting for BABAKOV with Congressmember-1 in City-2.

b.   On or about January 11, 2017, CC-3 sent an email

to VOROBEV advising that CC-3 and CC-1 were working on behalf of
BABAKOV to facilitate meetings in the United States with
advisors to a U.S. Official.

      c.    In or about February 2017, BABAKOV, VOROBEV, and
PLISYUK applied for visas to enter the United States,
identifying CC-1 as their contact in the United States.

      d.    In or about March 2017, CC-1 prepared the March
2017 Letter on behalf of BABAKOV and transmitted the letter to
the office of Congressmember-2 seeking a meeting for BABAKOV
with Congressmember-2.

      e.    In or about April 2017, CC-1 sent an email to
Congressmember-2's office inviting Congressmember-2 to attend
the Conference in Yalta and for Aksyonov's organizing committee
to pay for Congressmember-2's travel.

    (Title 18, United States Code, Sections 371 and 3238.)

### Count Two
(Conspiracy to Commit Visa Fraud)

The Grand Jury further charges:

64.   The allegations contained in paragraphs 1 through 59
of this Indictment are incorporated as though fully set forth
herein.

65.   From at least in or about January 2017, up to and

including at least in or about June 2017, in the Southern

District of New York, Russia, and elsewhere outside of the

jurisdiction of any particular State or district of the United

States, ALEKSANDR MIKHAYLOVICH BABAKOV, ALEKSANDR NIKOLAYEVICH

VOROBEV, and MIKHAIL ALEKSEYEVICH PLISYUK, the defendants, and

others known and unknown, at least one of whom is expected to be

first brought to and arrested in the Southern District of New

York, knowingly combined, conspired, confederated, and agreed

together and with each other to commit an offense against the

United States, to wit, visa fraud in violation of Title 18,

United States Code, Section 1546(a).

    66.   It was a part and an object of the conspiracy that

ALEKSANDR MIKHAYLOVICH BABAKOV, ALEKSANDR NIKOLAYEVICH VOROBEV,

and MIKHAIL ALEKSEYEVICH PLISYUK, the defendants, and others

known and unknown, knowingly (i) made under oath, and under

penalty of perjury under Title 28, United States Code, Section

1746, knowingly subscribed as true, false statements with

respect to material facts in applications, affidavits, and other

documents required by the immigration laws and regulations

prescribed thereunder, and knowingly presented such

applications, affidavits, and other documents which contained

false statements and which failed to contain any reasonable

basis in law and fact, and (ii) would obtain, receive, and possess a visa or other document prescribed by statute or regulation for entry into or as evidence of authorized stay in the United States, knowing it to have been procured by means of any false claim or statement, or to have been otherwise procured by fraud or unlawfully obtained, to wit: BABAKOV, VOROBEV, and PLISYUK participated in a scheme to fraudulently obtain visas permitting them to travel to the United States to meet with U.S. officials and advisors in furtherance of their foreign influence scheme, by submitting applications containing false statements designed to conceal that they were traveling together and the true purpose of their trip.

67.    In furtherance of the conspiracy and to effect the illegal object thereof, ALEKSANDR MIKHAYLOVICH BABAKOV, ALEKSANDR NIKOLAYEVICH VOROBEV, and MIKHAIL ALEKSEYEVICH PLISYUK, the defendants, and their co-conspirators, committed the following overt acts, among others:

a.    On or about February 7, 2017, BABAKOV, VOROBEV, and PLISYUK each applied for a visa to enter the United States, and each falsely stated on his application that he was traveling alone.

b.    On or about February 8, 2017, BABAKOV falsely

38

claimed to a U.S. consular official that he was "traveling to NYC for vacation alone."

      c.  On or about February 8, 2017, VOROBEV falsely claimed to a U.S. consular official that he was traveling "to visit friends NYC and DC."

      d.  On or about February 8, 2017, PLISYUK falsely claimed to a U.S. consular official that the purpose of his travel was "[t]o continue to vacation/visit friends."

      (Title 18, United States Code, Sections 371 and 3238.)

### Count Three
(Conspiracy to Violate the
International Emergency Economic Powers Act)

The Grand Jury further charges:

68.  The allegations contained in paragraphs 1 through 59 of this Indictment are incorporated as though fully set forth herein.

69.  From at least in or about January 2017, up to and including at least in or about June 2017, in the Southern District of New York, Russia, and elsewhere outside of the jurisdiction of any particular State or district of the United States, ALEKSANDR MIKHAYLOVICH BABAKOV, ALEKSANDR NIKOLAYEVICH VOROBEV, and MIKHAIL ALEKSEYEVICH PLISYUK, the defendants, and others known and unknown, at least one of whom is expected to be first brought to and arrested in the Southern District of New

York, knowingly and willfully did combine, conspire,

confederate, and agree together and with each other to violate

licenses, orders, regulations, and prohibitions in and issued

under the International Emergency Economic Powers Act (IEEPA),

codified at Title 50, United States Code, Sections 1701-1708.

70.  It was a part and an object of the conspiracy that

ALEKSANDR MIKHAYLOVICH BABAKOV, ALEKSANDR NIKOLAYEVICH VOROBEV,

and MIKHAIL ALEKSEYEVICH PLISYUK, the defendants, and others

known and unknown, would and did provide and cause others,

including U.S. persons, to provide, funds, goods, and services

by, to, and for the benefit of Sergey Aksyonov, a Specially

Designated National, without first obtaining the required

approval of OFAC, in violation of Executive Orders 13660, 13661,

and 13662, and 31 C.F.R. § 589.201.

71.  It was further a part and an object of the conspiracy

that ALEKSANDR MIKHAYLOVICH BABAKOV, ALEKSANDR NIKOLAYEVICH

VOROBEV, and MIKHAIL ALEKSEYEVICH PLISYUK, the defendants, and

others known and unknown, would and did receive and cause

others, including U.S. persons, to receive, funds, goods, and

services from Sergey Aksyonov, a Specially Designated National,

without first obtaining the required approval of OFAC, in

violation of Executive Orders 13660, 13661, and 13662, and 31

C.F.R. § 589.201.

72.   It was further a part and an object of the conspiracy that ALEKSANDR MIKHAYLOVICH BABAKOV, ALEKSANDR NIKOLAYEVICH VOROBEV, and MIKHAIL ALEKSEYEVICH PLISYUK, the defendants, and others known and unknown, would and did engage in transactions, including with U.S. persons, to evade and avoid, and attempt to evade and avoid, the requirements of U.S. law with respect to the provision of funds, goods, and services by, to, or for the benefit of, and the receipt of funds, goods, and services from, Sergey Aksyonov, a Specially Designated National, in violation of Executive Orders 13660, 13661, and 13662, and 31 C.F.R. § 589.201.

(Title 50, United States Code, Section 1705;
Executive Orders 13660, 13661, and 13662;
Title 31, Code of Federal Regulations, Section 589.201; Title
18, United States Code, Section 3238.)

**FORFEITURE ALLEGATIONS**

73.   As a result of committing the offense alleged in Count Two of this Indictment, ALEKSANDR MIKHAYLOVICH BABAKOV, ALEKSANDR NIKOLAYEVICH VOROBEV, and MIKHAIL ALEKSEYEVICH PLISYUK, the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(6), all conveyances, including any vessel, vehicle, or aircraft, used in

the commission of said offense; all property, real and personal,
that constitutes or is derived from or is traceable to the
proceeds obtained directly or indirectly from the commission of
the offense; and all property, real or personal, that was used
to facilitate, or was intended to be used to facilitate, the
commission of said offense, including but not limited to a sum
of money in United States currency representing the amount of
proceeds traceable to the commission of said offense.

74.  As a result of committing the offense alleged in Count
Three of this Indictment, ALEKSANDR MIKHAYLOVICH BABAKOV,
ALEKSANDR NIKOLAYEVICH VOROBEV, and MIKHAIL ALEKSEYEVICH
PLISYUK, the defendants, shall forfeit to the United States,
pursuant to Title 18, United States Code, Section 981(a)(1)(C)
and Title 28, United States Code, Section 2461, any and all
property, real and personal, that constitutes or is derived from
proceeds traceable to the commission of said offense, including
but not limited to a sum of money in United States currency
representing the amount of proceeds traceable to the commission
of said offense.

## Substitute Assets Provision

75.  If any of the above-described forfeitable property, as
a result of any act or omission of the defendants:

a.   cannot   be   located   upon   the   exercise   of   due

diligence;

b.   has been transferred or sold to, or deposited with,

a third person;

c.   has   been   placed   beyond   the   jurisdiction   of   the

Court;

d.   has been substantially diminished in value; or

e.   has   been   commingled   with   other   property   which

cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United

States Code, Section 853(p) and Title 28, United States Code,

Section 2461(c), to seek forfeiture of any other property of the

defendants up to the value of the above forfeitable property.

(Title 18, United States Code, Sections 981 and 982;
Title 21, United States Code, Section 853;
Title 28, United States Code, Section 2461.)

_____
FOREPERSON

_____
DAMIAN WILLIAMS
United States Attorney

Form No. USA-33s-274 (Ed. 9-25-58)

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

### UNITED STATES OF AMERICA

v.

### ALEKSANDR MIKHAYLOVICH BABAKOV,
### ALEKSANDR NIKOLAYEVICH VOROBEV, and
### MIKHAIL ALEKSEYEVICH PLISYUK,

Defendants.

### SEALED INDICTMENT

22 Cr. _____

(18 U.S.C. §§ 371, 951, 1546, and 3238;
50 U.S.C. § 1705.)

DAMIAN WILLIAMS
United States Attorney

*Foreperson*

Indictment filed under Seal.
3 warrants, 3 counts.

VBMS Willis